UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Big Red Box, LLC,<br><br>                  Plaintiff<br><br><br>vs.<br><br>Square, Inc., William Tye Grisel, Joe Grisel, G5 Marketing Solutions, LLC, and Branch Banking & Trust Co.,<br><br>                  Defendants | Civil Action No.   3:18-cv-00758-JMC-SVH<br><br><br>**THIRD AMENDED COMPLAINT**<br><br><br>(Jury Trial Requested) |

Plaintiff, complaining of the Defendants above-named, would show this Court:

**JURISDICTION**

1.  Plaintiff, Big Red Box, LLC ("BRB") is a limited liability company whose members and nerve center are in Columbia, South Carolina.

2.  Defendant Square, Inc. ("Square") is a foreign corporation with its principal place of business, "nerve center" and headquarters in the State of California.

3.  The Defendant William Tye Grisel ("Tye Grisel") is an individual who resides in Lexington, South Carolina.

4.  The Defendant Joe Grisel ("Joe Grisel") is an individual who resides at 617 Willowood Trail, Keller, Texas.

5.  The Defendant G5 Marketing Solutions, LLC ("G5") is or was a limited liability company registered under the laws of the State of Texas on February

25, 2016, with its registered office street address at 2600 Juniper Drive, Euless, Texas, 76039.

6.  Upon information and belief, G5 is administratively dissolved and has lost its right to conduct business in Texas.

7.   G5's sole member was Tye Grisel.

8.  Defendant Branch Banking & Trust Co., ("BB&T") BB&T is a foreign corporation with its principal place of business, "nerve center" and headquarters in the state of North Carolina.

9.  As described below the Plaintiff, BRB, suffered significant financial losses and other concrete injuries in fact due to the conduct of Defendants herein which are likely to be redressed by a favorable judicial decision, an award of damages, and assessment of fines and punitive damages.

10.  This Court has jurisdiction over the parties and subject matter of this action under 28 U.S.C. §§ 1331 and 1337.

## FACTUAL ALLEGATIONS

11.  BRB owns and operates a business that rents dumpsters locally, brokers the rental of dumpsters nationwide, and employs dozens of people in Columbia, South Carolina, including in its local call center.

12.  A significant portion of BRB's business depends on handling incoming calls from people and businesses around the country needing to rent a construction dumpster.  BRB generates these calls through heavy internet advertising and marketing, and from the purchase of call "leads" from third-party vendors. If, for example, an incoming "lead" wishes to rent a dumpster in Arizona, BRB brokers the provision of the dumpster through a local provider and receives a portion of the rental fee.

13.  BRB customarily spends tens of thousands of dollars per month on call leads from third-party vendors, as its business depends heavily upon them.

14.  In or around November of 2013, Plaintiff hired Defendant William Tye Grisel ("Tye Grisel") to work in its Sales, Marketing and IT Department(s).

15.  Part of Grisel's job was to work with third-party vendors who provided the above-described call "leads."

16.  Unbeknownst to Plaintiff, on or about May 9, 2014 Grisel opened an account with Defendant Square for a fictitious business he called "The List" or "LocalListConstruction.com" (hereafter, "Local List").

17.  Grisel opened the Square account using the e-mail address "thelist1978@gmail.com," a Texas "business" phone number 469-751-2597, a personal phone number of 803-477-7559, and a physical address of 161 Woodcrest Lane, Gaston, SC 29053.

18.  Local List was a complete fiction.  It was not an "LLC" or other corporate entity under the laws of any state.

19.  The "LocalListConstruction.com" website accepted by Square in opening the account did not actually exist.

20.  After conjuring the fictitious Local List business into existence and opening a Square account, Defendant Tye Grisel embarked upon a scheme to present "Local List" to BRB as a vendor of call "leads" whose "invoices" could be paid using BRB's credit cards.

21.  In reality, the money paid to Local List went into Grisel's Square account, and from there to bank account(s) in his control, including those opened at BB&T.

22.  Through this scheme, within three years after Square opened an account, Grisel had used it to defraud BRB of at least $1,049,996.97.

3

23.     The success of the scheme relied upon the knowing, negligent, or reckless complicity of the Defendants Square and BB&T, and their neglect of established rules and procedures.

24.     The timeline and specifics of this scheme were as follows:

- November 13, 2013 - Grisel becomes employed by BRB.

- 2014 – Grisel, as an IT and Marketing manager, gains use of a BRB company Mastercard issued by Bank of America, ending in 0589.

- May 9, 2014 – Grisel opens the "Local List" Square account through Square's website using ███████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████

- May 12, 2014 – Square tells Grisel how to make ████████████ ████████████████████████████████████████ ██████████████████████████████

- May 15, 2014  - Square begins processing and receiving fraudulent charges made by Grisel against BRB's Bank of America Mastercard 0589.  The Merchant name appearing on BRB's credit card statements is "SQ *LOCALISTCONSTR" with no mention of Grisel.

- June 1, 2014 – Square processes a second "SQ *LOCALISTCONSTR" charge on Mastercard 0589 for $1,946.70 with the same notation.

- June 15, 2014 – May 18, 2015 – Square processes 25 more SQ *LOCALISTCONSTR" charges, in increasing amounts against the Mastercard, bringing the total of all fraudulent charges processed by Square on Mastercard 0589 to $138,751.50.

- June 3, 2015 – Grisel continues the scheme using an American Express (AMEX) card issued to BRB officer Ellen Brown, making his first charge for $11,107.60.  The charges appear on AMEX statements as "LOCALLISTCONSTRIOColumbia SC."

---

[1] Square uses Visa Merchant Category Classification Codes to classify the type of business.  The Code given for Local List is 7392.
https://www.dm.usda.gov/procurement/card/card_x/mcc.pdf

- July 23, 2015 @ 2:46 pm – After accepting, from June 3rd – July 9th, $52,664.40 in AMEX charges (and transactions now totaling $191,413.90 from Local List's apparently single customer, BRB), ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████ "

- July 23, 2015 @ 3:32 pm – ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

- July 23, 2015 @5:44 pm – Overlooking that it has just received in, in the course of ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ without ever noting the disparity.

- July 24, 2015 @1:25 pm – after repeated back and forth with Grisel ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

- July 24, 2015 @ 2:54 pm – ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[2] Grisel, when ultimately confronted by BRB in 2017, would claim that Steve Wazinski was the president or owner of Local List Construction.

[REDACTED]

- Despite the above discrepancies, Square does NOT attempt to contact Ellen Brown, or anyone else at BRB, about the above.

- July 24 – 28, 2015 – Over the next four days, [REDACTED] still never noticing.

- July 29, 2015 @10:06 a.m. - Square finally writes: [REDACTED]

- From July 23, 2015 until Grisel's scheme unravels in March of 2017, another **$858,583.07** will be charged against BRB by Square.  Despite the existence of [REDACTED] Square will never again challenge or question a single charge, or suspend the account for even a moment.

- February 9, 2016 – Square allows Grisel to open a *second* account under name "G5 Marketing Solutions"  with [REDACTED] Square does not question how a "marketing consultant" could have a [REDACTED] reserved for non-profit organizations, realize that the webpage does not actually exist, the fact [REDACTED] is a UPS Store.

- February 25, 2016 – G5 Marketing Solutions, LLC is first registered by Grisel with Texas Secretary of State.

- February 29, 2016 – with a $100.00 deposit, BB&T opens an account for "G5 Marketing Solutions, LLC, accepting its business address as 2600 Juniper Drive, Euless, TX 76039-4046.   The address is actually that of a residence, linked to a company called "Cyndex," and affiliated with Joe Grisel.

- March 11, 2016 – Square links the BB&T account to Grisel's Square account so the transactions Square processes will be deposited into the G5 BB&T account.  In the first 30 days of the account, $33,313.14 is deposited.  In that same time, Grisel will withdraw almost as much for clearly personal expenses from an account ostensibly owned by a limited

---

[3] Grisel, who worked on site with Ellen Brown, presumably took Brown's driver's license from her purse and forged her name.

liability company.  Ultimately BB&T will allow G5's funds to be used freely by Grisel and transferred between multiple other accounts he opens at BB&T.

- March 12, 2016 – After commingling several hundred thousand dollars in siphoned payments to Local List among legitimate charges made by other BRB vendors, Grisel leaves BRB's employment to start his own "consulting" business, G5 Marketing Solutions.  Grisel purports to "serve" BRB as a liaison between it and its SEO and call leads vendors, prominent among them the fictional Local List.  For G5's services, BRB pays approximately $1,600.00 per month.

- March 2016 – April 28, 2017, Square processes, and BB&T accepts for deposit into G5 Marketing, LLC's "business" account, another $611,286.46 in Square transaction payable not to "G5 Marketing Solutions, LLC," but to "William Tye Grisel."

- March and April of 2017, - Grisel's scheme unravels when it becomes apparent that the call "leads" invoiced by "Local List" are duplicates of those already invoiced by another vendor KBD.  When challenged, Grisel disclaims any ownership of Local List and states it is owned and run by a "Steve Wazinksi."

- December 11, 2018 – A Federal Grand Jury returns a 153-count indictment against Grisel for the $1,049,996.97 scheme.  3:18-cr-01097-JFA (Dkt. No.2).

- Present – Despite the indictment, a portion of the stolen funds for which Grisel has been indicted remain in the hands of Square. Per its website, Square charges fees of 3.5% plus .15 cents per transaction keyed in by Grisel.[4]  To date, Square has not returned these fees to BRB.


**Square's Role in Grisel's Scheme**

25.    Defendant Square advertises its ability to turn any computer or phone into a

"Payment Terminal," promising that a user can "type in any card number into

[a] computer and have the fund deposited into [an] account the next day."

---

[4] All of Grisel's transactions were keyed in to the "Square Register" app provided to him by Square, which allows input of credit cards without having to swipe them or have them otherwise physically present.

26. Defendant Square provides users with equipment, including card readers and application software, for this purpose.

27. Square earns money by taking a cut of each transaction (2.75% per swipe or 3.75% plus 15 cents for manually typed transactions).

28. Square knows that its products are used "for illegal or improper uses, including fraudulent or illegal sales of goods or services, money laundering, and terrorist financing." (emphasis added).

29. Because Square profits from operating a system it knows can be misused, Square must exercise due care to prevent misuse and protect foreseeable victims.

30. Consistently therewith, Square must adopt rules for itself and its Users designed to prevent misuse of its products and enforce those rules.

31. Square must ███████████████████████████████████
███████████████████████████████████████████
█████████████

32. Square must further ██████████████████████████████
███████

33. Square must follow the above rules in the ███████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████

34. Square must train its employees to follow these Rules, and that training must be ongoing.

35. Square must supervise its employees to ensure that they are following these Rules.

36. Square must enforce the rules it imposes on Users intended to prevent fraud.

37.    By following the rules in the above four areas, Square can minimize – or prevented entirely – foreseeable harm to innocent parties, such as Big Red Box.

38.    If Square ignores these rules, however, harm is inevitable.

39.    As set forth below, Square's repeated failure to follow the rules, and its ignorance of multiple red flags in the Grisel account(s), caused Big Red Box to be defrauded for nearly $1.1 million dollars.

**Account Opening**

40.    Square knows that ████████████████████████████████ ████████████████████████████████████████████ when the account is opened.

41.    Square further knows that its systems allow its users to choose the name that ████████████████████████████████████████ processed by Square for its User, which could disguise the User's true identity.

42.    Thus, if a new User of a Square account lists a name other than his own on the account – such as the name of a purported business – Square must determine if that business exists.

43.    Square must also ████████████████████████████████ ████████████████████████████████ to ensure that persons charged by Square's Users know whom they are actually paying.

44.    Beyond that, if the purported User's business is in ███████ █ █████ ████████████████████████████████████████

─────────────────────

5 ████████████████████████████████████████████████ ████████████████



45.  On or about May 9, 2014, Defendant Square assisted Defendant William Tye Grisel in opening a Square Account.

46.  Despite Square's ██████████████████████████████ ████ Grisel was allowed to open the account under the false name, "The List."

47.  Although Grisel's purported "business" was for "professional services," ████████████████████████████████████████ ████████ Square required no additional information such as articles of incorporation or licenses for "Local List."

48.  Had Square requested same, it would have found none existed.

49.  Had Square requested Local List's EIN number, it would have received none.

50.  Had Square looked at Local List's "website," LocalListConstruction.com, it would have found a dead link.  If it looked beyond for additional "web presence" for Local List's purported "professional search engine optimization and/or web design business) it would have found nothing.

51.  Had Square followed its own verification rules for high risk businesses, it would have learned that Local List was a fiction.

52.  As a direct and proximate result of Square's failure to follow the rules, the first and ████████████████████ ways to prevent its system from being used for fraud, was neglected.

53.     Three days after opening the account, on May 12, 2014, Square aided Grisel to make another name, "Local List Construction" appear on customer credit and debit card invoices and prevent his own name from appearing.6

54.     Grisel thereafter used Square's help, and its system, to make it appear to BRB as if the charges it thereafter received from "Local List" were from a third-party vendor with no connection to Grisel.

55.     Over the next year, with no questions asked by Square, Grisel would use Square's help and its system to steal $138,751.50 from BRB.

**Account Monitoring**

56.     Square must ██████████████████████████████ ███████████.

57.     Square must ████████████████████████████████ ██████████████████████████.

58.     Square must ███████████████████████████ ██████████████████████.

59.     Square must ████████████████████████████ ██████████████████████████.

60.     Square's ████████████████████████████ ████████████████████████████████████ ██████████████.

---

6 While Square may argue ███████████████████ that ████████████ users should be allowed to list their business name on receipts and statements, simply by requiring such users to list such business as what they legally are, e.g., "Tye Grisel d/b/a Local List Construction" Square could have prevented the entirety of the fraud in this case, and likely beyond this case. By choosing to allow names that do not identify the actual User ████████████████████, however, Square cannot disclaim responsibility for ensuring the listed entity's legitimacy.

7 ████████████████████████████████████████████████████████████.

b. ███████████████████████████████

c. ███████████████████████████████

███████████████████████████████████

███████████████████████████████████

61. Regarding the above red flags, had Square been monitoring the account as required, it would have seen:

    a. That every one of the 79 transactions processed by Square (totaling almost $1.1 Million) were made using the same three credit cards and three ████, to wit: 27 transactions to the same BANA Mastercard ████ 5474) totaling $138,751.50, and 52 transactions to same or similar AMEX (████ 3767 and 3727) totaling $911,245.47. Besides these three cards ████, Square processed no other charges on Grisel's Square account. <u>In other words, the sole purpose of the Square's Local List account was to charge one of three credit cards belonging to a single payor, BRB.</u>

    b. That 58 of the 79 transactions were at, near, or above ███████ █████████ and numerous transactions more than doubled ██████████.

    c. That, on multiple occasions, Local List initiated transactions █ ███████████████████████████████ ████████████ These included numerous charges made without explanation in Keller, TX; Raleigh, NC; Bryson City, NC,

---

[8] 

and Merritt Island, FL.  Many or most of these charges exceeded $20,000.00. [9]

62.     Besides its obligation to monitor accounts for suspicious or fraudulent activity, Square has the right and duty ██████████████████████ ████████████████████████████ ███████████████.

63.     Under Square's ███████████████████████



64.     On July 23, 2015, after Square had processed nearly $200,000 in charges that ██████████████████████, Square for the first time suspended Grisel's account and requested he provide ███████████ ████████████████████████████.

    a.     Heedless of the fact that ████████████████████



    b.     Although Square recognizes, as any reasonable person must, that a User's

---

[9] ████████████████████████████████████████
████████████

██████████████████████████████

█████████████████, Square proceeded to ignore the fact that Grisel began identifying himself as "**Steve Wazinski.**"  Beyond not even asking why, Square proceeded to communicate interchangeably with Grisel/Wazinski over the next several days.  Similarly, no alarm was raised when Grisel, to ███████ the arms-length agreement between Local List, and Big Red Box, inadvertently left his BRB company email address ("tye@brbdumpstercom") in the foot of the contract.

65. Thus, even as its ████████████████ created more questions than it answered, Square asked none of them.

66. Likewise, although Square had the name of the other parties to the contract – including Ellen Brown (whose AMEX cards Square had repeatedly charged and whose driver's license Square now had) Square did not try to contact Brown personally.

67. Had Square contacted Brown and simply mentioned that its User was actually Grisel, his fraud would have ended in 2015 and been limited to a sixth of what it eventually totaled. Instead, on July 29, 2015, without ever talking to anyone other than Grisel, Square restored Grisel's account rights in full.

68. Square would never again question a single transaction.

69. As a direct and proximate result,  Grisel went on to steal another $858,583.07 from BRB.

### Linking of Square Accounts to BB&T

70. Square allows bank accounts (e.g., checking accounts) to be linked by Users to the Square account, so money processed by Square (after being held by Square) is transferred to the User's bank account.

14

71. 

72. On or about February 9, 2016, Grisel opened a second Square account his own name for "G5 Marketing Solutions"

73. Upon information and belief, as with Local List, Square did not verify the legitimacy of G5 Marketing. Had it done Square would have found that G5 Marketing did not actually yet exist as a corporate entity.

74. It would not so exist until February 25th.

75. On or about February 29, 2016, G5 Marketing Solutions, LLC opened an account at Defendant BB&T Bank, using a registered agent address for G5 of 2600 Juniper Drive, Euless, TX 76039-4046,

76. Upon information and belief, on or about March 11, 2016 Grisel linked both the "Local List" and "G5"accounts to the G5 Marketing Solutions, LLC account at BB&T Bank. Both Square accounts were, however in his individual name, and the only Square account that was used to process the account was the "Local List" account which belonged, personally, to Grisel.

77. The subsequent transfer by Square, over the next year, of $611,286.46 into the BB&T from Grisel's Square account again raised Square's ███████████

b. 

78. At any time, Square could have questioned why funds payable to "Local List" (a/k/a Grisel) were being deposited into an account belonging to G5 Marketing Solutions, LLC, but never did.

79. Had Square done so, and/or had it suspended such transactions, $611,286.46 of the fraudulent transactions would have been prevented.

**Suspension or Closing Square Accounts**

80. Square 

81. At the appearance of

82. However, in the over 1,000 days that Square maintained account(s) for Grisel, it suspended his ability to use the accounts on a single occasion in 2015, for 5 days.

83. Had Square followed                                  Square's system could never have been used by Grisel to defraud BRB.

84. By not following            , Square caused Big Red Box to be harmed for $1,049,996.97.

---

[10] While Grisel opened a Square account under the name G5 Marketing Solutions, the LLC itself had no Square account.  Moreover, all of the payments made to Square later deposited into G5's LLC account at BB&T were payable to Grisel individually.

85.    Perversely, ███████████████ instead of harm to itself, Square

pocketed 2.75% to 3.75%  of each transaction, at zero risk to itself.

**The Role of BB&T**

86.    Defendant BB&T, as a financial institution, must comply with the Bank

Secrecy Act, Anti-Money Laundering rules, USA PATRIOT Act, and

FinCen's Know Your Customer (KYC) guidelines, and develop and exercise

its own due diligence guidelines.

87.    Regarding the opening and use of business accounts, BB&T is required to (a)

identify and verify the identity of its customer, (b) identify and verify the

identity of "beneficial owner" of customers that are legal entities, and (c)

conduct ongoing monitoring to identify suspicious transactions.

88.    As part of these obligations, Defendant BB&T is also required create a model

of "expected transactional behavior" for the business type and monitor the

accounts for deviations from that expected behavior.

**Account Opening**

89.    On or about February 29, 2016, G5 Marketing Solutions, LLC opened an

account at Defendant BB&T Bank, using a registered agent address for G5 of

2600 Juniper Drive, Euless, TX 76039-4046,

90.    Because G5 was an LLC, BB&T had to identify and verify its legitimacy and

properly identify its beneficial owner.

91.    Had BB&T attempted to verify the address it accepted from G5, "2600

Juniper Drive, Euless, TX" it would have discovered it to be a residential

home claimed as a business address for at least 18 companies[11] many of which were owned or controlled by Joe Grisel and implicated in alleged fraudulent conduct. See, <u>Sullins, et. al., v. Joe Grisel, et al.</u>, Cause No. 348-282711-15, Tarrant County, Texas.

92.    Had BB&T inquired into the "beneficial owner" of G5 Marketing Solutions, LLC, it would have learned that Tye Grisel did not live at the address given to BB&T in Texas – or anywhere in Texas -- but resided in South Carolina.

93.    Thus, BB&T allowed the account -- created specifically by Grisel for personal receipt of stolen funds -- to be opened.


**<u>Account Monitoring</u>**

94.    After allowing the account to be opened, BB&T had an affirmative obligation to "conduct ongoing monitoring to identify suspicious transactions" under the Bank Secrecy Act, Anti-Money Laundering rules, and FinCen guidelines, and general fraud prevention practices. Suspicious activities, a/k/a red flags for fraud include, but are not limited to:

    a.  Unexplained changes in business address to a state other than where the account was opened.

    b.  Using addresses meant to appear as the physical address of the business, but which are not.

    c.  The opening of additional accounts under different names – including business names --  and transfers among such accounts.

---

[11] Camaten LLC, La Corrida Investments LLC, Cyndex Services LLC, Hed First LLC, Hair Today Gone Tomorrow Electrolysis LLC, Yys Media LLC, Xm316 LLC, Color Your World LLC, Fcs Foundation And Concrete Srv LLC, Virtuosity Formulations LLC, Piston Power Publishing LLC, Fcs Foundation Repair LLC, G5 Marketing Solutions LLC, Aeg Enterprises LLC, Chadwell Business Svcs LLC, Jdu Enterprises LLC, Ppsftw LLC, and Enlightened Legacy Global LLC.

    d.   The existence of electronic transactions at or above the reportable CTR threshold ($10,000).

    e.   The payment of patently non-business expenses from a business account, and/or treatment of a business-owned account as the personal account of an individual.

    f.   The deposit of funds payable to a party other than the business into the business account.

    g.   Sudden changes in account activity.

95.   In the present case, red flags for fraud appeared almost immediately in the account BB&T allowed to be opened for G5. These include but were not limited to:

    a.   The change of address in the first month of the account's existence from the Texas address to "141 Pelham Dr., STE F139, Columbia, SC 29209."

    b.   That 141 Pelham Dr., STE F139, Columbia, SC 29209 is a UPS Store near Garner's Ferry Road, in Columbia, SC; not a "physical address" at which any person associated with "G5" could be found, as required by law.[12]

    c.   The opening of five additional BB&T accounts under different names in 2016 and 2017, including an individual account for "William Tye Grisel," a business account for "G5 d/b/a Sweet Tease," a business account for "G5 d/b/a Columbia Discount Auto," one for "G5 d/b/a Mobile Thrones and one for "G5 d/b/a Drone FX," using the same

---

[12] See, CIP rule (31 C.F.R. § 103.121), which implements §326 of the USA PATRIOT. Shell, fictional or fraudulent companies frequently use "Rental Addresses" to disguise their activities and appear legitimate.

UPS Store address, and subsequent transfer of funds between accounts.

d. The existence of <u>29</u> transactions at or above the reportable CTR threshold ($10,000) without, presumably, any notation, challenge or activity reporting.

e. The payment of obviously non-business expenses from the "G5 Marketing Solutions, LLC, account" including Child Support obligations, personal credit cards, and gambling expenses.

f. The deposit, without apparently any challenge or question by BB&T, of numerous deposits from Square not properly payable to G5 Marketing Solutions, LLC but personally to "William Tye Grisel."

g. The change, from an account begun with $100.00, to monthly deposits that approached or exceeded $70,000.00, with withdrawals nearly as high.

96. To the extent BB&T fulfilled its obligation to create a model of expected transactional behavior for a sole member marketing LLC, with no employees other than Grisel, the behavior of G5 grossly departed from that model.

97. Despite multiple red flags in the account opening, in ongoing activity and behavior, BB&T took no action to question or restrict use of the accounts.

98. As a direct and proximate result of BB&T's wrongful acts, Tye Grisel was allowed to steal $611,286.46 from Plaintiff BRB.

**The Role of Joe Grisel**

99. Upon information and belief, Joe Grisel (and the companies owned or controlled by him) participated with Tye Grisel.

100. Upon information and belief, at least 13 of the transactions set forth above were made at or around Joe Grisel's home on Willowood Trail, in Keller, Texas.

101. Joe Grisel's Willowood address was likewise given to Square as an address for Local List Construction and appeared on invoices created using Square Register's software.

102. Joe Grisel allowed Tye Grisel to use another address, 2600 Juniper Drive, Euless, TX as the initial straw address for G5 Marketing Solutions, LLC.

103. Joe Grisel allowed Grisel to use Cyndex, a company he is affiliated with (and which is involved in a civil conspiracy lawsuit in Tarrant County, Texas) as registered agent for G5.

104. Upon information and belief, Defendant Joe Grisel received and used funds or otherwise benefited directly or indirectly from funds rightfully belonging to Plaintiff, in an amount to be shown at trial and otherwise benefited from the scheme.

**Damage to Plaintiff as a Result of Defendants' Wrongful Acts**

105. As a direct and proximate result of Defendants' wrongful acts, Plaintiff has suffered out of pocket losses of at least $1,049,996.97.

106. Defendants are jointly and severally liable for the losses and such other damages, costs, attorney's fees, interest thereon, and other relief as awarded at trial in the above amount, except that Defendant BB&T's liability for actual damages of the above amount is limited to the $611,286.46 received by BB&T into the account(s) it created for Grisel.

107. Defendant Square earned, by its participating in this scheme, transaction fees between $15,465.81 and $41,000 from fraudulent transactions made by Grisel, for which it is liable along with such other sums stolen.

108. As a direct and proximate result of Defendants' negligent, reckless, willful, intentional, and unlawful conduct, its violations of the Plaintiff's rights under state and federal law Plaintiff has been damaged in an amount to be determined by the trier of fact.

109. The harms caused by Defendants is likely to be redressed by a favorable judicial decision, and through both injunctive relief, an award of damages, and assessment of fines and punitive damages.

## FIRST CAUSE OF ACTION
## AS TO DEFENDANTS SQUARE, BB&T,
## G5 MARKETING SOLUTIONS, LLC, &  JOE GRISEL

### (Aiding and Abetting)

110. The allegations contained hereinabove are repeated as if fully alleged herein verbatim, to the extent not inconsistent with the allegations of this cause of action.

111. Plaintiff would show that Defendant Tye Grisel owed Plaintiff a fiduciary duty and was bound to act with good faith and due regard to the interest of the Plaintiff.

112. Defendant Square – who was provided applicant information by Tye Grisel and saw during its July 2015 ▮▮▮▮▮▮▮▮ that Grisel had BRB company e-mail address, knew or should have known that Grisel was employed by Defendant and as such owed a fiduciary duty.

113. As set forth hereinabove, while employed by Plaintiff, Defendant Tye Grisel breached his duties to the Plaintiff by way of the fraudulent schemes described hereinabove.

114. Defendant Square not only knew of the breach but participated in each fraudulent transaction herein but profited directly from such transactions.

115. Defendant Tye Grisel's scheme involved direct or obvious fraudulent charges, for his direct and obvious benefit, in clear breach of his fiduciary duties to the Plaintiff.

116. Defendants Square, BB&T, G5, and Joe Grisel knowingly or recklessly participated in these transactions, and directly aided and enabled Tye Grisel to breach his fiduciary duty to the Plaintiff.

117. Defendant Square knowingly participated in allowing the opening of the account and processing of stolen funds and retaining a portion thereof as fees.

118. As a direct and proximate result of Defendants' assistance, by reckless or intentional means to be shown at trial, Plaintiff has been damaged in an amount to be determined by the trier of fact.

## FOR A SECOND CAUSE OF ACTION
## AS TO DEFENDANTS SQUARE, BB&T, G5 SOLUTIONS, LLC, TYE GRISEL & JOE GRISEL

### (Conversion)

119. The allegations contained hereinabove are repeated as if fully alleged verbatim, to the extent not inconsistent with the allegations of this cause of action.

120. The actions of Defendants constitute conversion of the money or property of Plaintiff.

121. The Plaintiff had an interest, including a property right, in the above sums.

122. Defendants converted Plaintiff's money to their own use, profiting directly from their actions (including fees "earned" on fraud transactions held by Square), which were converted to their own respective uses.

123. Because of the unlawful conversion of property by Defendants, injuries have been inflicted upon Plaintiff that may be recovered by way of judgment

against Defendants for a sum over the value of all sums converted, plus interest, other consequential damages, punitive damages, costs and attorney's fees.

### FOR A THIRD CAUSE OF ACTION
### AS TO DEFENDANTS SQUARE  & BB&T

**(Action for Money Had & Received)**

124.  The allegations contained hereinabove are repeated as if fully alleged verbatim, to the extent not inconsistent with the allegations of this cause of action.

125.  Defendant Square held money – including holding at least for a time the proceeds of each and every transaction complained of – for the benefit of Tye Grisel, Joe Grisel, or G5.

126.  Defendant Square at present retains "fees" that it earned on fraudulent transactions.

127.  Defendant BB&T may, upon information and belief, held sums on deposit obtained by fraud, not properly payable to G5 but nevertheless deposited into the account of G5 Marketing.

128.  Upon information and belief, Defendant BB&T holds or may hold sums in accounts for other Defendants herein containing funds stolen from Plaintiff BRB.

129.  Defendants ought, in equity and good conscience, to pay said money over to the Plaintiff.

130.  Plaintiffs respectfully request that this Court issue an order directing same, plus such other relief as is just and proper.

### FOR A FOURTH CAUSE OF ACTION
### AS TO DEFENDANTS SQUARE & BB&T

**(Unjust Enrichment)**

131. The allegations contained hereinabove are repeated as if fully alleged verbatim, to the extent not inconsistent with the allegations of this cause of action.

132. Defendants have been enriched at Plaintiff's expense.

133. Defendants are without justification for retaining or earning any sum from the fraudulent activities described above.

134. To the extent Plaintiff lacks otherwise an adequate remedy at law, Plaintiff respectfully request this Court issue an order directing return of said sums, plus such other relief as is just and proper.

### FOR A FIFTH CAUSE OF ACTION
### AS TO DEFENDANTS SQUARE& BB&T

**(Negligence)**

135. The allegations contained hereinabove are repeated as if fully alleged verbatim, to the extent not inconsistent with the allegations of this cause of action.

136. Defendants Square and BB&T owed Plaintiffs a duty to exercise due care which arises by statute, regulation, and the common law, ███████████
███████████████████████████████████
█████████████

137. Defendants' duty arises additionally from their undertaking to protect third parties.

138.   Defendants' duty arises additionally from their undertaking to generate fees and profits by providing services to Grisel and his confederates including G5, which fees were paid by BRB, and which to date are retained by Defendants.

139.   Defendants breached their duties to Plaintiff BRB as described above, and in such other respects as may be shown at trial.

140.   The breach of duty by Defendants was in conscious, reckless disregard of the rights of Plaintiff.

141.   As a direct and proximate result of the negligent, careless, reckless, willful and wanton acts and omissions of the Defendants, judgment should be granted to the Plaintiff for both actual and punitive damages.

## FOR A SIXTH  CAUSE OF ACTION AS TO DEFENDANTS SQUARE, G5 MARKETING SOLUTIONS, LLC,  & BB&T
### (Violation of SC Code §39-5-10)

142.   The allegations contained hereinabove are repeated as if fully alleged verbatim, to the extent not inconsistent with the allegations of this cause of action.

143.   The allegations contained hereinabove are repeated as if fully alleged herein verbatim, to the extent not inconsistent with this cause of action.

144.   The activities of the Defendants constitute "trade or commerce" as defined by South Carolina Code Section 39-5-10, et.seq., (as amended).

145.   The actions of the Defendants, above described, constitute unfair and deceptive acts and practices in the conduct of trade and commerce, as prohibited by the South Carolina Unfair Trade Practices Act, 39-5-10 et.seq., and are willful violations thereof.

146.    The actions of the Defendants have a real and substantial potential for repetition and affect the public interest, as shown by the following facts and such others as may be shown at trial:

 a.   The assessment and processing of fraudulent charges by one or both Defendants on over 79 occasions;

 b.   Square's pattern and practice of allowing, participating in, and profiting by a willful failure to ████████████████ ████████████████████████████ ████████████████████████████████ ████████

 c.   BB&T's pattern and practice of allowing alleged "corporate" accounts to be opened without following standards and regulations (including those referenced above) intended to prevent money laundering, terrorist financing, or fraud, and allowing free use of business entity accounts by individuals.

 d.   Multiple instances of deceptive and fraudulent acts committed against Plaintiff by Defendant G5.

147.    The Plaintiff has suffered an ascertainable loss due to the unlawful actions of the Defendants, entitling Plaintiff to recover actual damages in an amount to be proven at trial, treble said actual damages, and an award of attorney's fees and costs.

**PRAYER FOR RELIEF**

WHEREFORE, the prayer of the Plaintiff is for judgment in an amount sufficient to compensate Plaintiff for actual damages, with punitive damages, statutory damages, such interest as is allowable by law, costs, attorney's fees, and such other relief as is just and proper.

DAVE MAXFIELD, ATTORNEY, LLC

By:     s/ Dave Maxfield
        David A. Maxfield, Esq., Fed ID 6293
        P.O. Box 11865
        Columbia, SC 29211
        803-509-6800
        855-299-1656 (fax)
        dave@consumerlawsc.com

July 25, 2019