IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Big Red Box, LLC, | ) | C/A No. 3:18-758-SAL-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Square, Inc., William Tye Grisel, | ) | REPORT AND |
| Joe Grisel, and G5 Marketing | ) | RECOMMENDATION |
| Solutions, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

Big Red Box, LLC ("Plaintiff"), a South Carolina limited liability company, brings this action asserting claims for aiding and abetting breach of fiduciary duty, conversion, action for money had and received, unjust enrichment, negligence, and violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10, *et seq.* ("SCUTPA"), against defendants Square, Inc. ("Square"), William Tye Grisel ("Tye Grisel"), Tye Grisel's father, Joe Grisel ("Joe Grisel"), and Tye Grisel's company, G5 Marketing Solutions, LLC ("G5")[1] (collectively "Defendants").[2]

---

[1] G5's sole member is Tye Grisel. [ECF No. 149 ¶ 7].

[2] Through the course of this case, Plaintiff additionally brought claims against American Express Company and Branch Banking & Trust Co. ("BB&T"), originally designated John Doe Bank. [*See* ECF No. 1, ECF No. 18, ECF No. 94, ECF No. 100, ECF No. 135]. Plaintiff's claims against these entities have been settled. [ECF No. 50, ECF No. 150]

This matter is before the court on: (1) Square's motion to dismiss [ECF No. 155], (2) Joe Grisel's motion to dismiss [ECF No. 162], and (3) Tye Grisel's motion to dismiss [ECF No. 163]. The motions are ripe for disposition.

Pursuant to the provisions of 28 U.S.C. § 636(b), and Local Civ. Rule 73.02(B)(2)(e) (D.S.C.), this matter has been referred to the undersigned for all pretrial proceedings. For the reasons that follow, the undersigned recommends the district judge grant in part and deny in part Square and Joe Grisel's motions to dismiss and deny Tye Grisel's motion to dismiss.

I.      Factual and Procedural Background

Plaintiff owns and operates a business that rents dumpsters locally, brokers the rental of dumpsters nationwide, and employs dozens of people in Columbia, South Carolina, including in its local call center. [ECF No. 149 ¶ 11]. A significant portion of Plaintiff's business depends on handling incoming calls from people and businesses around the country needing to rent a construction dumpster. *Id.* ¶ 12. Plaintiff generates these calls through heavy internet advertising and marketing, and from the purchase of call "leads" from third-party vendors. *Id.* If, for example, an incoming "lead" wishes to rent a dumpster in Arizona, Plaintiff brokers the provision of the dumpster through a local provider and receives a portion of the rental fee. *Id.* Plaintiff customarily spends tens of thousands of dollars per month on call

leads from third-party vendors, as its business depends heavily upon them. *Id.* ¶ 13.

On November 13, 2013, Plaintiff hired Tye Grisel to work in its Sales, Marketing, and IT Departments. *Id.* ¶¶ 14, 24. Part of his job was to work with third-party vendors who provided the above-described call "leads." *Id.* ¶ 15. Unknown to Plaintiff, on or about May 9, 2014, Tye Grisel opened an account with Square for a fictitious business he called "The List" or "LocalListConstruction.com" ("Local List"). *Id.* ¶¶ 16, 24.

Square advertises its ability to turn any computer or phone into a "Payment Terminal," promising that a user can "type in any card number into [a] computer and have the fund deposited into [an] account the next day." *Id.* ¶ 25. Square provides users with equipment, including card readers and application software, for this purpose. *Id.* ¶ 26. Square earns money by taking a cut of each transaction, 2.75% per swipe or 3.75% plus 15 cents for manually-typed transactions. *Id.* ¶ 27.[3]

Tye Grisel opened the Square account using the e-mail address thelist1978@gmail.com, a Texas "business" phone number 469-751-2597, a

---

[3] Plaintiff alleges that Square knows that its products are used "for illegal or improper uses, including fraudulent or illegal sales of goods or services, money laundering, and terrorist financing." [ECF No. 149 ¶ 28]. Plaintiff further alleges that while conducting its business, Square, among other obligations, must comply with the Bank Secrecy Act ("BSA") and its implementing regulations (Anti-Money Laundering rules or "AML rules"), the Electronic Funds Transfers Act ("EFTA"), as well as the Network Rules of

personal phone number of 803-477-7559, and a physical address of 161 Woodcrest Lane, Gaston, SC 29053. *Id.* ¶ 17. Local List was a fiction and was not a limited liability company or other corporate entity under the laws of any state. *Id.* ¶ 18. The "LocalListConstruction.com" website did not exist. *Id.* ¶ 19. The business was represented to Square as a "Management, Consulting and Public Relations Service." *Id.* ¶ 24.

On May 12, 2014, Square instructed Tye Grisel how to make "Local List Construction" appear on Plaintiff's credit card statements and invoices, so his own name would not appear. *Id.* On May 15, 2014, Square began processing and receiving fraudulent charges made by Tye Grisel against Plaintiff's Bank of America Mastercard 0589. *Id.*[4] The merchant name appearing on Plaintiff's credit card statements was "SQ *LOCALISTCONSTR" with no mention of Tye Grisel. *Id.*

On June 1, 2014, Square processed a second "SQ *LOCALISTCONSTR" charge on Mastercard 0589 for $1,946.70 with the same notation. *Id.* From June 15, 2014, to May 18, 2015, Square processed 25 more "SQ *LOCALISTCONSTR" charges, in increasing amounts against Plaintiff's Mastercard, bringing the total of all fraudulent charges processed by Square

---

MasterCard and AMEX. *Id.* ¶¶ 31–32; *see also id.* ¶¶ 25–85.

[4] Plaintiff alleges that all of Tye Grisel's transactions were manually keyed into the "Square Register" app provided to him by Square, which allows input of credit cards without having to swipe them or have them otherwise physically present. [ECF No. 149 ¶ 24 n.4].

on Mastercard 0589 to $138,751.50. *Id.*

On June 3, 2015, Tye Grisel used an American Express ("AMEX") card issued to Plaintiff's officer Ellen Brown ("Brown"), making his first charge on that card for $11,107.60. *Id.* The charges appeared on AMEX statements as "LOCALLISTCONSTRIOColumbia SC." *Id.* From June 3rd to July 9th, 2015, Square accepted $52,664.40 in AMEX charges from Tye Grisel, with transactions totaling $191,413.90 from Local List's single customer, Plaintiff. *Id.*

On July 23, 2015, at 2:46 p.m., Square emailed "Tye Grisel" at thelist1978@gmail.com, stating Square was suspending transactions pending "verification" to "ensure the financial security of both you and your customers." *Id.* At 3:32 p.m., thelist1978@gmail.com wrote back to Square as follows: "Why is my account under review? Need someone to contact me. This money cannot be withheld. Things have to be paid tomorrow. 803-477-5596." *Id.* After Square replied that the review will take one business day, thelist1978@gmail wrote back as "Steve Wazinski" ("Wazinski") at 5:39 p.m., asking "What is the reason for the verification? I have bee [sic] with you guys over a year!" *Id.*

At 5:44 p.m., Square asked Tye Grisel/Wazinski for "secondary" information, stating "We hope to make this process as easy as possible so you can get back to business." *Id.* Following another challenge from Tye

Grisel/Wazinski, Square replied, stating "Dear Tye . . . ." *Id.* Thereafter, Square replied to queries using Tye Grisel and Wazinski interchangeably. *Id.*

The next day, at 1:25 p.m., after repeated emails with Tye Grisel/Wazinski, Square stated as follows:

> We noticed that you processed multiple payments from a single customer using [the AMEX and Bank of America credit cards]. When a single account processes large amounts to a single instrument, this only increases the potential fallout should disputes arise.

*Id.* Square then requested a copy of the cardholder's identification card, the service contract with the cardholder, and the cardholder's signature on a Square provided form. *Id.* At 2:54 p.m., "Wazinski" emailed Square a copy of a purported "contract" between LocalListConstruction.com and Plaintiff. The contract contained a cut and pasted image of Brown's signature, and Tye Grisel's own signature on behalf of LocalListConstruction.com. *Id.*[5] However, Tye Grisel inadvertently left his own company email address, "tye@brbdumpster.com," on the footer of the contract. *Id.*

From July 24 through 28, 2015, Square corresponded interchangeably with Wazinski and Tye Grisel at the same email address and with Tye Grisel via Twitter @tgrizzle1. *Id.* On July 29, 2015, at 10:06 a.m., Square wrote as follows: "Hello Tye, We're happy to report that after reviewing your Square

---

[5] Plaintiff states that Tye Grisel "who worked on site with Ellen Brown, presumably took Brown's driver's license from her purse and forged her name." [ECF No. 149 at 6 n.3].

account, we've returned your account to active status and resumed regular deposits to your linked bank account." *Id.* Square apologized for any inconvenience caused. *Id.* From July 23, 2015, until March 2017, another $858,583.07 was charged against Plaintiff by Square, with no challenges by Square or suspension of the account. *Id.*

On February 9, 2016, Tye Grisel opened a second account with Square under the name "G5 Marketing Solutions" using website www.gvsolutions.org, email address griselmarketing@gmail.com, and physical address of 141 Pelham Drive, Suite F, Columbia, SC 29209. *Id.* Plaintiff alleges that Square did not question how a "marketing consultant" could have a ".org" web address reserved for nonprofit organizations, did not realize that the webpage does not actually exist, nor realized that "141 Pelham Drive" is a United Parcel Service store. *Id.*

On February 25, 2016, Tye Grisel registered G5 with the Texas Secretary of State. *Id.* On February 29, 2016, with a $100 deposit, BB&T opened an account for "G5 Marketing Solutions, LLC," accepting its business address as 2600 Juniper Drive, Euless, TX 76039-4046. *Id.* This address is a residential address linked to a company called "Cyndex." *Id.* Plaintiff alleges Joe Grisel allowed Tye Grisel to use Cyndex, a company with which Joe Grisel is affiliated, as a registered agent for G5. *Id.* ¶ 103.

On March 11, 2016, Square linked the BB&T account to Tye Grisel's

Square account so the transactions processed by Square would be deposited into the G5 BB&T account. *Id.* ¶ at 24. In the first 30 days of the account, $33,313.14 was deposited. *Id.* During this time, Tye Grisel withdrew almost as much for personal expenses. *Id.* Ultimately BB&T allowed G5's funds to be transferred among multiple other accounts he opened at BB&T. *Id.*

Plaintiff alleges that on March 12, 2016, after commingling several hundred thousand dollars in siphoned payments to Local List among legitimate charges made by Plaintiff's other vendors, Tye Grisel left Plaintiff's employment to start his own consulting business, G5. *Id.* At that time, Plaintiff entered into an agreement with G5, paying G5 approximately $1,600.00 per month, for Tye Grisel to act as a liaison between Plaintiff and its search engine optimization and call leads vendors, prominent among them the fictional Local List. *Id.*

From March 2016 through April 28, 2017, Square processed, and BB&T accepted for deposit into G5's account, another $611,286.46 in Square transactions payable to "William Tye Grisel." *Id.* Plaintiff alleges that at least 13 transactions were made at or around Joe Grisel's home on Willowood Trail, in Keller, Texas. *Id.* ¶ 100.[6]

In March and April 2017, Plaintiff alleges it became apparent that the

---

[6] Joe Grisel's Willowood address also was given to Square as an address for Local List Construction and appeared on invoices created using Square Register's software. [ECF No. 149 ¶ 101].

call "leads" invoiced by "Local List" were duplicates of those already invoiced by another vendor, KBD. *Id.* ¶ 24. When challenged, Tye Grisel disclaimed any ownership of Local List and stated it was owned and ran by a "Steve Wazinski." *Id.*

Plaintiff alleges that within three years after Square opened the account, Tye Grisel had used that account to defraud Plaintiff of at least $1,049,996.97. *Id.* ¶ 22. Plaintiff further alleges that Square earned transaction fees between $15,465.81 and $41,000 from fraudulent transactions made by Tye Grisel. *Id.* ¶ 107. On December 11, 2018, a Federal Grand Jury returned a 153-count indictment against Tye Grisel regarding the fraud perpetuated on Square. *Id.* ¶ 24.[7]

On March 19, 2018, Plaintiff filed the instant suit against Defendants, alleging various causes of actions that Square then moved to dismiss. [ECF No. 1, ECF No. 16]. In May and June 2018, Plaintiff requested entry of default as to G5 and Tye Grisel, and entry of default was entered as to each on May 7, 2018, and June 8, 2018, respectively. [ECF No. 11, ECF No. 13, ECF No. 21, ECF No. 22].

On May 29, 2018, Plaintiff filed first amended complaint. [ECF No. 18]. In response, Tye Grisel filed an answer on June 12, 2018 [ECF No. 25], and

---

[7] On November 7, 2019, Tye Grisel pled guilty to count 65 of the indictment. [ECF No. 171-1 at 1].

Square filed a motion to dismiss on August 9, 2018 [ECF No. 42]. On September 25, 2018, Plaintiff moved in part for commencement of discovery, which the undersigned granted "to the extent it requests authorization to conduct discovery related to the resolution of Square Inc.'s motion to dismiss." [ECF No. 55, ECF No. 64, *see also* ECF No. 66, ECF No. 87, ECF No. 90, ECF No. 104]. On March 19, 2019, Plaintiff filed second amended complaint [ECF No. 100] that Square then moved to dismiss on April 8, 2019 [ECF No. 109].

On August 7, 2019, Plaintiff filed its operative and third amended complaint [ECF No. 135, ECF No. 149 (unredacted)], that Square then moved to dismiss in the instant motion to dismiss, filed on September 30, 2019 [ECF No. 155]. Although Tye Grisel and Joe Grisel did not previously file motions to dismiss Plaintiff's previous complaints, both sought on October 17, 2019, to dismiss Plaintiff's third amended complaint. [ECF No. 162, ECF No. 163].

Plaintiff brings the following claims in its third amended complaint against the following defendants:

(1)   Aiding and abetting breach of fiduciary duty against Square, G5, and Joe Grisel,

(2)   Conversion against Square, G5, Joe Grisel, and Tye Grisel,

(3)   Action for money had and received against Square,

(4)   Unjust enrichment against Square,

(5)   Negligence against Square, and

(6)    Violation of SCUTPA against Square and G5.

[ECF No. 149 ¶¶ 110–147].

II.    Discussion

A.    Standard of Review

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court is "not required to accept as true the legal conclusions set forth in a plaintiff's complaint." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). Indeed, "[t]he presence of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint cannot support" the legal conclusion. *Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir. 2001).

B.    Analysis

1.    Entry of Default as to Tye Grisel and G5

Before turning to Plaintiff's claims addressed in the pending motions to dismiss, the court addresses the preliminary matter of entry of default as to Tye Grisel and G5.

As to Tye Grisel, Plaintiff argues that because Tye Grisel has not moved to vacate the entry of default against him, he "lacks standing to challenge liability via his instant motion" to dismiss. [ECF No. 166 at 2].[8]

Fed. R. Civ. P. 55(c) allows the court to set aside an entry of default for good cause. The good cause standard is liberally construed "to provide relief from the onerous consequences of defaults and default judgments." *Lolatchy v. Arthur Murray, Inc.*, 816 F.2d 951, 954 (4th Cir. 1987); *see also Tolson v. Hodge*, 411 F.2d 123, 130 (4th Cir. 1969) ("Any doubts about whether relief should be granted should be resolved in favor of setting aside the default so that the case may be heard on the merits."); *Colleton Preparatory Acad., Inc. v. Hoover Universal, Inc.*, 616 F.3d 413, 417 (4th Cir. 2010) ("We have repeatedly expressed a strong preference that, as a general matter, defaults be avoided and that claims and defenses be disposed of on their merits."). Given this guidance, the court construes the motion to dismiss filed by Tye Grisel, proceeding pro se, as a challenge to the entry of default entered against him and, as discussed below, finds good cause exists to set aside the entry of default.

The Fourth Circuit has outlined the following six factors that district courts may examine in deciding whether to grant relief from default for good

---

[8] Tye Grisel did not file reply to Plaintiff's opposition to his motion to dismiss, and therefore has not addressed this argument.

cause shown: (1) whether the moving party has a meritorious defense, (2) whether it acts with reasonable promptness, (3) the personal responsibility of the defaulting party, (4) the prejudice to the party, (5) whether there is a history of dilatory action, and (6) the availability of sanctions less drastic. *Payne ex rel. Estate of Calzada v. Brake*, 439 F.3d 198, 204–05 (4th Cir. 2006).

First, Tye Grisel appears to have a potentially meritorious defense to Plaintiff's complaint, as outlined in his motion to dismiss and discussed below. *See United States v. Moradi*, 673 F.2d 725, 727 (4th Cir.1982) ("[A]ll that is necessary to establish the existence of a 'meritorious defense' is a presentation or proffer of evidence, which if believed, would permit either the Court or the jury to find for the defaulting party."). Next, although Tye Grisel did not move to vacate the entry of default against him, he filed an answer to Plaintiff's amended complaint on June 12, 2018, days after default was entered against him. Additionally, he has remained active in the case since filing his answer, including filing his motion to dismiss, and Plaintiff has not argued any prejudice to it if the court sets aside default. Instead, Plaintiff has submitted an opposition to Tye Grisel's motion to dismiss, arguing why it should be denied on the merits. Finally, there are less drastic alternatives to allowing the entry of default to stand.

As to G5, Tye Grisel's company, no party has addressed its current status, and default was entered against it on May 7, 2018. [ECF No. 13]. To the extent Tye Grisel seeks to respond to claims against G5 on G5's behalf [*see* ECF No. 163 (moving to dismiss claim for aiding and abetting brought against G5 and not Tye Grisel)], he is unable to do so because a limited liability company cannot proceed without counsel. *See, e.g., Broad. Music, Inc. v. O'Neal Burroughs, LLC*, C/A No. 419-00391-RBH-KDW, 2019 WL 5855979, at *2 (D.S.C. July 30, 2019) (citing *In re Under Seal*, 749 F.3d 276, 290 n.17 (4th Cir. 2014), Local Civ. Rule 83.I.07(B) (D.S.C.)).

However, because Plaintiff has never moved for default judgment as to G5, it is unclear whether Plaintiff has abandoned its claims against G5 for (1) aiding and abetting, (2) conversion, and (3) violation of SCUTPA. In order to resolve G5's status in this case, the undersigned recommends the district judge direct Plaintiff to either file a motion for default judgment as to G5 or dismiss it from this suit.

In sum, the undersigned recommends the district judge set aside default as to Tye Grisel and direct Plaintiff to file either a motion for default judgment as to G5 or file a notice that it is dismissing G5 from this suit.

2.     Claim for Aiding and Abetting Breach of Fiduciary Duty

Both Square and Joe Grisel move to dismiss Plaintiff's claim against them for aiding and abetting breach of fiduciary duty. In South Carolina,

"[t]he elements for aiding and abetting a breach of fiduciary duty are (1) a breach of a fiduciary duty owed to the plaintiff; (2) the defendant's knowing participation in the breach; and (3) damages." *Bennett v. Carter*, 807 S.E.2d 197, 200 (S.C. 2017) "The gravamen of the claim [for aiding and abetting] is the defendant's knowing participation in the fiduciary's breach." *Id.* (citing *Future Group, II v. Nationsbank*, 478 S.E.2d 45, 50 (S.C. 1996)).

Under South Carolina law, "[a] fiduciary relationship exists when one imposes special confidence in another, so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one imposing the confidence." *O'Shea v. Lesser*, 416 S.E.2d 629, 631 (S.C. 1992). In the employment context, courts have declined to find existence of a fiduciary duty in the context of a mere at-will employment relationship. *See, e.g., Hooters of America, Inc. v. Phillips*, 39 F.Supp.2d 582, 607 (D.S.C. 1998) (citation omitted) ("An employer/employee relationship is not a fiduciary relationship. . . ." because "[a] fiduciary relationship cannot be established by the unilateral action of one party."); *Wired Fox Techs., Inc. v. Estep*, No. C/A 6:15-331-BHH, 2017 WL 1135288, at *10 (D.S.C. Mar. 27, 2017) ("a mere employer-employee relationship is not sufficient to create a fiduciary duty under South Carolina law"). Also, an arms-length relationship, like that of an independent contractor, does not give rise to a fiduciary relationship. *See id.* at *11 ("Defendants convincingly argue that if a

traditional employer/employee relationship alone is not sufficient to give rise to a fiduciary duty, an independent contractor relationship can hardly be sufficient in that score.").

Plaintiff alleges it hired Tye Grisel in November 2013 "to work in its Sales, Marketing and IT Department(s)." [ECF No. 149 ¶ 14]. Tye Grisel remained an employee until March of 2016, when he started G5 and continued to provide Plaintiff with his services for $1,600.00 per month. *Id.* ¶ 24. Plaintiff has not alleged adequate facts to show that Tye Grisel was more than an at-will employee and contractor. Therefore, nothing Plaintiff alleges in its third amended complaint plausibly supports any circumstance under which Plaintiff and Tye Grisel maintained the sort of special relationship required to establish the obligations of a fiduciary duty between them. Thus, there could be no aiding and abetting of any breach of a fiduciary duty where, here, Tye Grisel did not have a fiduciary duty to Plaintiff to breach.

Plaintiff argues that because it provided Tye Grisel with a company credit card when he was employed by Plaintiff, and also thereafter as a contractor, "[a] reasonable finder of fact could certainly find from this allegation that the fiduciary relationship" between Plaintiff and Tye Grisel existed and continued to exist. [ECF No. 164 at 21]. However, in support, Plaintiff cites numerous cases that do not hold that, under South Carolina law, a fiduciary duty exists under such circumstances. *See Hendricks v.*

*Clemson Univ.*, 578 S.E.2d 711, 716 (S.C. 2003) (holding issue of whether a fiduciary relationship exists is a question for the court, noting "[h]istorically, this Court has reserved imposition of fiduciary duties to legal or business settings, often in which one person entrusts money to another, such as with lawyers, brokers, corporate directors, and corporate promoters," and declining to "recognize the relationship between advisor and student as a fiduciary one"); *O'Shea*, 416 S.E.2d at 632 (declining to impose "the high standard of fiduciary duty on planned community organizations, such as the Board, which are vested with the discretion to ensure that proposed modifications to residential property enhance the entire community"); *Regions Bank v. Schmauch*, 582 S.E.2d 432, 444 (S.C. Ct. App. 2003) (citations omitted) ("South Carolina holds the normal relationship between a bank and its customer is one of creditor-debtor and not fiduciary in nature. However, a bank may be held to a fiduciary duty if it undertakes to advise a depositor as part of services the bank offers. Such a relationship charges the bank with a duty to disclose material facts that may affect its customer's interests. Yet, no fiduciary relationship between a bank and its depositor exists when the bank is unaware of any special trust reposed in it."); *Steele v. Victory Sav. Bank*, 368 S.E.2d 91, 94 (Ct. App. 1988) (S.C. Ct. App. 1988) (holding it was for the jury to determine whether the intermediary was the remitter's agent, the extent of that agency, and whether the remitter reposed special confidence

and trust in the bank that would give rise to a fiduciary relationship; thus, a directed verdict had been improperly granted).[9]

Plaintiff additionally cites *SSI Med. Servs., Inc. v. Cox*, 392 S.E.2d 789 (S.C. 1990). In this case, the Supreme Court of South Carolina held a confidential fiduciary relationship existed, supporting imposition of constructive trust, where an employee wrongfully retained funds owed to his employer. *Id.* at 793–94. Although the court recognized a fiduciary relationship in this employment context, the court did so also in the context of imposing a constructive trust, which is a remedy, not a cause of action, that should be used "broadly speaking, whenever necessary to prevent injustice." *Dominick v. Rhodes*, 24 S.E.2d 168, 173 (S.C. 1943); *see also Whitmire v. Adams*, 257 S.E.2d 160, 163 (S.C. 1979) (holding a constructive trust is an equitable remedy used "to vindicate right and justice or frustrate fraud").

The imposition of a constructive trust is not an issue currently before the court. Additionally, Plaintiff has not identified, nor is the court aware, of

---

[9] Plaintiff also argues "[i]t is axiomatic that an employee owes a duty of loyalty and fidelity to his employer," citing *Foreign Acad. & Cultural Exch. Servs., Inc. v. Tripon*, 715 S.E.2d 331 (S.C. 2011) in support. [ECF No. 164 at 21]. However, that case did not address the issue of a claim based on a fiduciary relationship and instead held only "[i]t is implicit in any *contract* for employment" that an employee has a duty of loyalty and fidelity. *Foreign Acad.*, 715 S.E.2d at 335 (emphasis added and citation omitted). Here, Plaintiff has not alleged the existence of an employment contract between it and Tye Grisel.

a single case, including those cases citing *SSI Med. Servs.*, where a South Carolina court has recognized a fiduciary relationship based on a standard at-will employment or contract arrangement, even where, as here, the employee is alleged to have been entrusted with the employer's credit cards.[10]

*See Clearwater Trust v. Bunting*, 626 S.E.2d 334, 337 (S.C. 2006) (noting that the existence of a fiduciary duty is a question of law for the court and "declin[ing] to impose a fiduciary duty as a consequence of [] unilateral actions"); *Coves Darden, LLC v. Ibanez*, No. 2014-000339, 2016 WL 4379419, at *5 (S.C. Ct. App. Aug. 17, 2016) (citing *Burwell v. S.C. Nat'l Bank*, 340 S.E.2d 786, 790 (S.C. 1986)) ("We can find no South Carolina authority providing all employees are agents of their employers and owe their employers fiduciary duties . . . . Rather, the record indicates only that Coves Darden unilaterally placed trust and confidence in Ibañez and that Ibañez agreed to work for Coves Darden. The unilateral actions of an employer do not create a fiduciary duty in its employees."); *Warner v. Lexington Med.*

---

[10] This court has noted that, in the employment context, South Carolina courts have recognized fiduciary duties created by statute, established as a matter of contract or agreement, based on officer and director obligations, "or those concerning the handling of money by employee," citing *SSI* for the last proposition; however, this court further held it "knows of no South Carolina decision, binding or persuasive, that has concluded that a typical, at-will employment arrangement implicates a sort of 'special confidence' such that a fiduciary duty arises to protect against harassment." *Smalls v. Imperial Servs. Grp., Inc.*, C/A No. 2:11-1223-DCN-BHH, 2011 WL 6027022, at *2 (D.S.C. Nov. 8, 2011), *report and recommendation adopted sub nom. Smalls*

*Ctr.*, C/A No. 3:17-1936-JFA-PJG, 2018 WL 2948012, at *2 (D.S.C. June 13, 2018) (finding no fiduciary relationship between a nurse and her employer).

As stated by the Fourth Circuit, "[c]ourts impose fiduciary duties only in limited circumstances." *In re Int'l Payment Grp., Inc.*, 733 F. App'x 98, 104 (4th Cir. 2018) (citing *Chapman v. Citizens & S. Nat'l Bank of S.C.*, 395 S.E.2d 446, 451 (S.C. Ct. App. 1990) (requiring the placing of "special confidence" in another)). The court declined to find a fiduciary relationship between a debtor and creditor, stating "this case lacks the unique facts that would allow such an imposition," *id.* Here, too, this case lacks any such allegations.[11]

Accordingly, the undersigned recommends dismissing Plaintiff's claim for aiding and abetting breach of fiduciary duty brought against Square and Joe Grisel.

### 3.    Claim for Conversion

Joe Grisel, Tye Grisel, and Square seek to dismiss Plaintiff's claim for conversion against them. "Conversion is 'the unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to

---

*v. Imperial Servs. Groups, Inc.*, C/A No. 2:11-1223-DCN, 2011 WL 6034469 (D.S.C. Dec. 5, 2011).

[11] Given the recommendation above, it is unnecessary to address Square's additional argument that Plaintiff "cannot and has not adequately pleaded that Square had the requisite knowledge of both the existence of Mr. Grisel's alleged fiduciary duty and his alleged breach of that duty or that Square knowingly participated in such breach." [ECF No. 155-1 at 13].

another to the exclusion of the owner's rights.'" *Bank of New York v. Sumter Cty.*, 691 S.E.2d 473, 479 (S.C. 2010) (citing *Moore v. Weinberg*, 681 S.E.2d 875 (S.C. 2009)). "Conversion may arise by some illegal use or misuse, or by illegal detention of another's chattel." *SSI Med. Servs.*, 392 S.E.2d at 792. "Money may be the subject of conversion when it is capable of being identified . . . ." *Id.*

### a. Conversion Against Joe Grisel

As to Joe Grisel, Plaintiff has alleged that of the 79 fraudulent transactions at issue, totaling transfer of $1,049,996.97, 13 were made at or around Joe Grisel's home on Willowood Trail, in Keller, Texas. [ECF No. 149 ¶¶ 22, 100]. Joe Grisel's home address was likewise given to Square as Local List Construction's business address and appeared on invoices created using Square Register's software. *Id.* ¶ 101. Another property related to Joe Grisel, 2600 Juniper Drive, Euless, TX, was used "as the initial straw address" for G5, and "Cyndex," a company with which Joe Grisel was affiliated, was listed as G5's registered agent. *Id.* ¶¶ 102, 103. Finally, Plaintiff alleges that Joe Grisel "received and used funds or otherwise benefited directly or indirectly from funds rightfully belonging to" Plaintiff. *Id.* ¶ 104.

Here, money is the subject of the cause of action for conversion. Plaintiff has sufficiently alleged that Joe Grisel converted to his own use or benefit certain funds of the $1,049,996.97 belonging to Plaintiff without

Plaintiff's permission. *See May v. Peninger*, C/A No. 2:07-00864C-WH, 2008 WL 509470, at *12 (D.S.C. Feb. 22, 2008) (denying motion to dismiss conversion claim); *Hall v. Storm Team Constr. Inc.*, C/A No. 6:18-00753-AMQ, 2018 WL 2461991, at *5 (D.S.C. June 1, 2018) (same).

Therefore, the undersigned recommends denying Joe Grisel's motion to dismiss as to Plaintiff's claim for conversion against him.

### b. Conversion Against Tye Grisel

Tye Grisel disputes the accuracy of allegations made by Plaintiff and argues that Plaintiff's claim for conversion against him should fail in that Plaintiff willingly provided him the credit cards in question and all transactions made by him were completed within his role to locate and purchase leads. [ECF No. 163-1 at 4–5, 11–12]. However, Tye Grisel does not argue, nor can he, that Plaintiff has failed to adequately allege a claim against him for conversion sufficient to survive his motion to dismiss. Therefore, the undersigned recommends denying Tye Grisel's motion to dismiss as to Plaintiff's claim for conversion against him.

### c. Conversion Against Square

Plaintiff alleges that even though all funds stolen from Plaintiff by Tye Grisel were possessed by Square "at least for a time during processing," Square has only detained a portion of these funds as "fees," and it is these

fees Square has converted. [ECF No. 164 at 23]. As alleged by Plaintiff, these fees amount to between $15,465.81 and $41,000.00. [ECF No. 149 ¶ 107].

A similar situation was addressed in *Song Chuan Tech. (Fujian) Co. v. Bank of Am., NA*, C/A No. 2:16-3269-RMG, 2017 WL 980248 (D.S.C. Mar. 10, 2017), *amended in part*, C/A No. 2:16-3269-RMG, 2017 WL 1862207 (D.S.C. May 8, 2017). There, plaintiff alleged that in the course of a business transaction, an unknown person hacked into his email account, and posing as a business partner, transmitted his own Bank of America account details to plaintiff to obtain fraudulently the sale proceeds due to the business partner. *Id.* at *1. Plaintiff then transferred $880,000 to the fraudster's account, and thereafter filed suit seeking in part to recover those funds from Bank of America, asserting a claim for conversion. *Id.*

The court held the plaintiff had failed to state a claim for conversion against defendant, reasoning as follows:

> Song Chuan alleges John Doe's fraud induced it to wire money to Bank of America. But simply alleging fraud by a bank customer does not create an immediate, established right to that customer's funds on deposit with the bank, enforceable against the bank in conversion. *See Owens v. Andrews Bank & Trust Co.*, 220 S.E.2d 116 (S.C. 1975) (holding a claim for conversion did not exist where an employee "had only a disputed claim for her wages, not an immediate right to payment"); *see also Terry v. Bank of Am., N.A.*, 350 F. Supp. 2d 727, 729-30 (W.D. Va. 2004) ("Plaintiffs cannot bring a claim for conversion unless they have a property interest in and are entitled to immediate possession of the converted item. In the present case, the plaintiffs' amended complaint fails to allege that the plaintiffs or the receivership entities were entitled to immediate possession of the funds in the

[customer] account at the time those funds allegedly were converted. As the bank points out, the general rule is that once funds are deposited in a bank account, the funds become the property of the bank."). In *Eisenberg v. Wachovia Bank, N.A.*, the Fourth Circuit discussed the facts of a Massachusetts fraud case where a Mr. "Rizzo, the chief fund raiser for the Tsongas Committee, opened a bank account at Andover Bank bearing the committee's name and listed himself as sole signatory" and "Rizzo used the bank account to convert the proceeds of contributions and loans to the Tsongas Committee to his own use." 301 F.3d 220, 225 (4th Cir. 2002) (internal quotation marks and citation omitted). It noted the funds Mr. Rizzo fraudulently obtained "were converted by Rizzo," not the bank. *Id. In other words, fraudulently obtained funds are converted by the fraudster, not his bank.* Proceeding to discuss an attempt to recover Mr. Rizzo's fraud from the bank on a negligence theory, the Fourth Circuit stated, "The mere fact that a bank account can be used in the course of perpetrating a fraud does not mean that banks have a duty to persons other than their own customers. To the contrary, the duty is owed exclusively to the customer, not to the persons with whom the customer has dealings." *Id.* at 225-26 . . . .

*Id.* at \*2 (emphasis added).

Likewise, here, Plaintiff alleges Tye Grisel's fraud induced it to pay him using Square and, in so doing, Square has retained fees in processing its client's fund transfers. However, "fraudulently obtained funds are converted by the fraudster . . . ." *Id.* Plaintiff's allegations fail to state an immediate, established right to the fees retained by Square. *See also Fitzgibbons on behalf of Dir. of S.C. Dep't of Ins. v. Atkinson*, C/A No. 817-02092-TMC-JDA, 2019 WL 5856265, at \*9 (D.S.C. Aug. 22, 2019) (citing *Int'l Agr. Corp. v. Lockhart Power Co.*, 188 S.E. 243, 246 (S.C. 1936)) ("A receipt of the proceeds, or a part thereof, of goods which have been wrongfully converted by

a third person is not a conversion, unless defendant participated in the wrongful act, or took such proceeds in accordance with a prior agreement which related to the act of conversion as well as to the sharing in the proceeds."); 7 American Law of Torts § 24:9 ("Although there are many cases in which a person who obtains possession of goods by fraud is regarded as liable for the conversion, it does not follow that every other person into whose hands the goods have come may be sued for conversion.").

Accordingly, the undersigned recommends granting Square's motion to dismiss as to Plaintiff's claim for conversion against it.

### 3.    Unjust Enrichment against Square

Square argues that Plaintiff's claim for unjust enrichment and action for money had and received are indistinguishable under South Carolina law [ECF No. 155-1 at 19], and Plaintiff states it does not oppose the consolidation of its claim for money had and received into its claim for unjust enrichment [ECF No. 164 at 25 n.14]. Therefore, the court proceeds to solely analyze Plaintiff's claim for unjust enrichment.

"Unjust enrichment is an equitable doctrine, which permits recovery of the amount that the defendant has been unjustly enriched at the expense of the plaintiff." *Regions Bank v. Wingard Properties, Inc.*, 715 S.E.2d 348, 356 (S.C. Ct. App. 2011) (citing *Dema v. Tenet Physician Servs.–Hilton Head, Inc.*, 678 S.E.2d 430, 434 (S.C. 2009); *Ellis v. Smith Grading & Paving, Inc.*,

366 S.E.2d 12, 15 (S.C. Ct. App. 1988)). To state a claim for unjust enrichment, "based on quantum meruit, quasi-contract, or implied by law contract, which are equivalent terms for equitable relief," a plaintiff must sufficiently allege "'(1) a benefit conferred by the plaintiff upon the defendant; (2) realization of that benefit by the defendant; and (3) retention of the benefit by the defendant under circumstances that make it inequitable for him to retain it without paying its value.'" *Id.* (citing *Myrtle Beach Hosp., Inc. v. City of Myrtle Beach*, 532 S.E.2d 868, 872 (S.C. 2000)).

Plaintiff argues it has adequately pled each element of this cause of action, turning the court's attention to *RLFShop, LLC, et al. v. American Express, et al.*, C/A No. 3:17-CV-405, 2018 WL 4030544 (S.D. Ohio August 23, 2018), where, as here, Plaintiff alleged an employee created a fraudulent account, in that case through PayPal instead of Square, and made fictitious invoices billed against the company's AMEX card, which PayPal processed, resulting in over $400,000 allegedly stolen, with PayPal retaining a portion of that amount in fees. The court in *RLFShop* found the issue of unjust enrichment a mixed question of fact and law that could not be resolved on a motion to dismiss, noting "Plaintiffs have alleged that they conferred a benefit on PayPal through the payment of transactions fees via their American Express account." *Id.* at *9.

Although Square argues in this case that "[t]here is no allegations . . . that BRB paid . . . fees or any other amount directly to Square" [ECF No. 170 at 14], here, too, Plaintiff has sufficiently alleged that it conferred a benefit on Square through the payment of transactions fees via Plaintiff's multiple credit card accounts. More specifically, Plaintiff alleges as follows:

> Square begins processing and receiving fraudulent charges made by Grisel against BRB's Bank of America Mastercard . . . . every one of the 79 transactions processed by Square (totaling almost $1.1 Million) were made using the same three credit cards . . . . Square allows bank accounts (e.g., checking accounts) to be linked by Users to the Square account, so money processed by Square (after being held by Square) is transferred to the User's bank account . . . . Square pocketed 2.75% to 3.75% of each transaction . . . .

[ECF No. 149 ¶¶ 24, 61, 70, 85].

Thus, Plaintiff alleges that money was transferred from its account to Square, was held by Square, was transferred by Square to Tye Grisel's account, and a fee was taken by Square. These allegations plausibly allege that Plaintiff conferred a benefit on Square. Cases cited by Square in opposition are inapposite to the present case, addressing relationships significantly more attenuated than that alleged here. *See Niggel Assocs., Inc. v. Polo's of N. Myrtle Beach, Inc.*, 374 S.E.2d 507, 509 (S.C. Ct. App. 1988) (holding any benefit operator of a golfing facility gained from contract between developer-defendant and contractors-plaintiffs was incidental and insufficient to state a claim for unjust enrichment where contractors-

plaintiffs had no dealings with operator of the facility); *Martin v. JTH Tax, Inc.*, C/A No. 9:10-03016-DCN, 2013 WL 1282224, at *7 (D.S.C. Mar. 27, 2013) (citation omitted) (dismissing unjust enrichment claim against two owners of a business because any benefit was received indirectly from the business itself, noting "[t]he Fourth Circuit has affirmed the dismissal of an unjust enrichment claim when '[a]t most,' all plaintiff 'can demonstrate [is] that [the defendant corporation], as opposed to [its owner], received a nongratuitous benefit.'"); *Johnson v. Ross*, 419 F. App'x 357, 364 (4th Cir. 2011) (holding "[b]ecause Plaintiffs fail to demonstrate any benefit retained by Defendant other than that realized by virtue of his status as a shareholder, they cannot maintain a cause of action for unjust enrichment against him individually").[12]

---

[12] In its complaint, Plaintiff alleges that Square had rights under its User Agreement to suspend or deactivate accounts if Square confirmed or suspected fraud and that the User Agreement provided that businesses could not list their business names on receipts and statements instead of identifying the actual user. [ECF No. 149 ¶ 80, page 11, n.6]. Square argues that "Plaintiff's own allegations that Square's actions were governed by the User Agreement" undercut Plaintiff's claim for unjust enrichment. [ECF No. 155-1 at 21]. Although courts have held that "[i]f the tasks the plaintiff is seeking compensation for under a quantum meruit theory are encompassed within the terms of an express contract which has not been abandoned or rescinded, the plaintiff may not recover under quantum meruit," *Swanson v. Stratos*, 564 S.E.2d 117, 120 (S.C. Ct. App. 2002), Plaintiff's allegations concerning the User Agreement do not encompass Square's fee arrangement, which is the basis of Plaintiff's unjust enrichment claim against Square, and Plaintiff has not alleged the existence of a contract between Plaintiff and Square.

In sum, Plaintiff has sufficiently alleged a benefit conferred by it on Square and that Square realized that benefit. Neither party has addressed the third element of this claim, and the court is not aware of binding precedent directly addressing the issue. Therefore, the undersigned recommends Plaintiff's claim for unjust enrichment, which encompasses Plaintiff's action for money had and received, proceed beyond the pleading stage and Square's motion to dismiss be denied as to this claim.

### 4.    Negligence against Square

Plaintiff has alleged Square owed it "a duty to exercise due care which arises by statute, regulation, and the common law, including the BSA, AML Rules, the USA PATRIOT Act, the EFTA, and [Square's] own stated rules and guidelines" and this duty "arises additionally from [Square's] undertaking to protect third parties" and "undertaking to generate fees and profits by providing services . . . ." [ECF No. 149 ¶¶ 136–38].

Under South Carolina law, "[i]n a negligence action, a plaintiff must show that (1) the defendant owes a duty of care to the plaintiff, (2) the defendant breached the duty by a negligent act or omission, (3) the defendant's breach was the actual and proximate cause of the plaintiff's injury, and (4) the plaintiff suffered an injury or damages." *Moore*, 681 S.E.2d at 878 (citing *Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 638 S.E.2d 650, 656 (S.C. 2006)). In examining a claim for negligence, "the court must

determine, as a matter of law, whether the defendant owed a duty of care to the plaintiff. If there is no duty, the defendant is entitled to judgment as a matter of law." *Huggins v. Citibank, N.A.*, 585 S.E.2d 275, 277 (S.C. 2003) (citations omitted).

"An affirmative legal duty exists only if created by statute, contract, relationship, status, property interest, or some other special circumstance." *Hendricks*, 578 S.E.2d at 714. Additionally, "[u]nder South Carolina law, there is no general duty to control the conduct of another or to warn a third person or potential victim of danger." *Doe ex rel. Doe v. Wal-Mart Stores, Inc.*, 711 S.E.2d 908, 911 (S.C. 2011) (citing *Faile v. S.C. Dep't of Juvenile Justice*, 566 S.E.2d 536, 546 (S.C. 2002)). The South Carolina Supreme Court recognizes five exceptions to this rule: "1) where the defendant has a special relationship to the victim; 2) where the defendant has a special relationship to the injurer; 3) where the defendant voluntarily undertakes a duty; 4) where the defendant negligently or intentionally creates the risk; and 5) where a statute imposes a duty on the defendant." *Id.* at 911–12 (citation omitted).

Here, there is no allegation that Square had a "special relationship" with Plaintiff, and the only relationship alleged between Square and Tye Grisel was one generally found between a business and its customer. The current allegations are unlike those found in *Murray v. Bank of Am., N.A.*,

580 S.E.2d 194, 198 (S.C. Ct. App. 2003). In *Murray*, the plaintiff sued a bank, claiming negligence. The plaintiff was not a customer of the bank, and plaintiff's driver's license had been used by an imposter to start a checking account at the bank. The court held that the "relationship between the Bank and Murray arose sufficient to impose upon the Bank a duty of care *when Murray went to the Bank* seeking closure of the account," stating "[t]he Bank failed to follow its own procedures, did not timely close the account, and did not notify any merchants that the account was fraudulent." *Id.* (emphasis added). Here, there is no allegation that Plaintiff contacted Square or had any interaction with Square such that *Murray*'s holding would be applicable.[13]

Plaintiff argues Square voluntarily undertook a duty and negligently or intentionally created the harm at issue, specifically pointing to Square's investigation in July 2015 that did not uncover the fraud alleged. [ECF No. 164 at 18, ECF No. 175 at 5–6]. However, Plaintiff fails to cite any case law so holding.[14] Instead, as Plaintiff admits, the South Carolina Supreme Court,

---

[13] Plaintiff briefly states that because "Square effectively charged BRB for services, it is difficult to contend that BRB is not in some sense Square's customer." [ECF No. 175 at 5 n.6, *see also* ECF No. 164 at 19 n.12]. However, Plaintiff's rationale, that it was effectively Plaintiff's customer, and how this applies to the claims at issue, is unclear.

[14] Plaintiff's citation to *Wright v. PRG Real Estate Mgmt., Inc.*, 826 S.E.2d 285 (S.C. 2019) is inapposite. In that case, the court held triable issues of fact prevented grant of summary judgment where owners, operators, and managers of a property undertook to provide security, allegedly did so

in response to a question certified from this court, has found no liability for a credit card issuer providing a credit card to an imposter because the bank had an insufficient relationship with the non-customer victim and plaintiff, to impose a duty of care. *Huggins*, 585 S.E.2d at 277. As held by the court, "the relationship, if any, between credit card issuers and potential victims of identity theft is far too attenuated to rise to the level of a duty between them." *Id.*

Plaintiff argues this case is distinguishable from *Huggins* in that Square charged Plaintiff's credit card 79 times, alleging Square did so by ignoring its own procedures at least 58 of those times, versus the limited number of times the bank issued a credit card to the imposter in *Huggins*. [ECF No. 164 at 19]. However, there is no indication that the number of alleged negligent activities at issue impacts the analysis of the existence of a duty, and the court itself recognized the size of the problem at issue:

> We are greatly concerned about the rampant growth of identity theft and financial fraud in this country. Moreover, we are certain that some identity theft could be prevented if credit card issuers carefully scrutinized credit card applications. Nevertheless, we . . . decline to recognize a legal duty of care

---

negligently, and disputed facts prevented determining whether their failure to exercise due care in performing the undertaking increased the risk of harm to plaintiff, a resident of the property, and whether plaintiff suffered harm because of her reliance on their undertaking. In that case, plaintiff had a direct relationship with the alleged negligent actors. Additionally, Plaintiff, in this case, has not alleged it suffered harm in reliance upon any action taken by Square or was even aware of any action taken by Square.

between credit card issuers and those individuals whose identities may be stolen.

*Huggins*, 585 S.E.2d at 277.

Plaintiff additionally argues *Huggins* is distinguishable in that Plaintiff has paid more than a million dollars, versus Huggins who had no legal liability for any charges or fees. [ECF No. 164 at 19]. Although Huggins may not have paid more than a million dollars, he alleged that "as a result of the Banks' issuance of credit cards to Doe, his credit was damaged, he was 'hounded by collection agencies,' he was distressed and embarrassed, and he expended much time and effort attempting to rectify the damage, with only partial success." *Huggins*, 585 S.E.2d at 276. Additionally, even if Plaintiff suffered more damage than Huggins, greater damage alleged does not create a legal duty.

Finally, Plaintiff argues that *Huggins* is distinguishable, as are all negligence cases concerning the duty of a bank to non-customers, in that Square is not a bank, Square (unlike a bank) does not bear the risk of loss, and Square continued to hold Plaintiff's money as fees. [ECF No. 164 at 19, ECF No. 175 at 4–5]. Plaintiff fails, however, to present case law indicating that the court's rationale in *Huggins* is inapplicable in the present instance because Square is not bank, does not bear the risk of loss in the way a bank does, and has not refunded fees it charged for its services.

Although the facts presented in this case and *Huggins* are different, they are not so different as to create circumstances here that give rise to a relationship between Square and Plaintiff so as to require a duty of care. The relationship between Square and Plaintiff remains "too attenuated to rise to the level of a duty between them." *Huggins*, 585 S.E.2d at 277. Additional case law buttresses this conclusion. *RLFShop*, 2018 WL 4030544, at *6 (holding PayPal owed no duty of care to the plaintiffs, whose employee made fraudulent purchases on the company AMEX card through PayPal's platform, and holding that the plaintiffs failed to allege the kind of special relationship that would impose such a duty of care); *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 225 (4th Cir. 2002) ("Courts in numerous jurisdictions have held that a bank does not owe a duty of care to a noncustomer with whom the bank has no direct relationship.").

Turning to Plaintiff's allegation that statutes or regulations create a duty, the court finds no such duty. First, while the BSA, as amended by the USA PATRIOT Act, requires certain institutions to enact, for example, anti-money laundering programs, an institution's liability for failure to comply is to the United States government. *See* 31 U.S.C. §§ 5318(h), 5321–22. "For this reason, courts are unanimous in holding that there is no private right of action under the BSA or Patriot Act," and "as there is no private right of action, there can be no duty of care arising out of the BSA's monitory

requirements." *Venture Gen. Agency, LLC v. Wells Fargo Bank, N.A.*, C/A No. 19-02778-TSH, 2019 WL 3503109, at *7 (N.D. Cal. Aug. 1, 2019) (collecting cases).

Additionally, "EFTA only applies to consumer accounts: the Act clearly states that its primary objective is to provide 'individual consumer rights'" and "[c]orporations or other business entities are not 'consumers' for the purposes of EFTA." *Binns v. BB & T Bank*, 377 F. Supp. 3d 487, 493 (E.D. Pa. 2019) (citing 15 U.S.C. § 1693; *Ironforge.com v. Paychex, Inc.*, 747 F.Supp.2d 384, 402 (W.D.N.Y. 2010); *Kashanchi v. Texas Commerce Med. Bank, N.A.*, 703 F.2d 936, 939-42 (5th Cir. 1983)).

Finally, regarding Plaintiff's arguments concerning Square's alleged violations of its internal policies and obligations under contracts with, for example, Bank of America and AMEX [ECF No. 149 ¶¶ 136–38, ECF No. 164 at 19–20], Plaintiff points to no case law holding a duty of care arises to a third-party when a business fails to follow its own internal policies or due to the terms of a contract to which a plaintiff is not a party nor beneficiary. *See Doe ex rel. Doe*, 711 S.E.2d at 912 (rejecting use of internal policies to establish a legal duty to a third-party, but holding policies could be relevant to issue of failure to exercise due care); *Caldwell v. K–Mart Corp.*, 410 S.E.2d 21, 24 (S.C. Ct. App. 1991) ("In negligence cases, internal policies or self-imposed rules are often admissible as relevant on the issue of failure to

exercise due care."); *Wade v. Chase Bank USA, N.A.*, C/A No. 2:12-3565-RMG, 2014 WL 12538883, *5–6 (D.S.C. Jan. 9, 2014) (holding that policy guidelines and contracts to which plaintiff was not a party could not form the basis of a duty to support plaintiff's negligence claim); *Gilbert v. Miller*, 586 S.E.2d 861, 864 (S.C. Ct. App. 2003) (affirming dismissal of a negligence action and rejecting plaintiff's claim that lease formed the basis of landlord's duty to protect plaintiff from harm on property, finding plaintiff was not a third-party beneficiary to the lease).

Accordingly, the undersigned recommends dismissal of Plaintiff's negligence claim against Square.

### 5. Violation of SCUTPA against Square

SCUTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. § 39–5–20(a). To state a SCUTPA claim, the plaintiff must allege "(1) that the defendant engaged in an unlawful trade practice, (2) that the plaintiff suffered actual, ascertainable damages as a result of the defendant's use of the unlawful trade practice, and (3) that the unlawful trade practice engaged in by the defendant had an adverse impact on the public interest." *Havird Oil Co. v. Marathon Oil Co.*, 149 F.3d 283, 291 (4th Cir.1998).

"Under South Carolina law, unfair or deceptive acts have an adverse impact upon the [public] if those acts have the potential for repetition."

*Bessinger v. Food Lion, Inc.*, 305 F.Supp.2d 574, 581 (D.S.C. 2003). Potential for repetition can be demonstrated by either "showing the same kind of actions occurred in the past, thus making it likely they will continue to occur absent deterrence" or "showing the company's procedures created a potential for repetition of the unfair and deceptive acts." *Singleton v. Stokes Motors, Inc.*, 595 S.E.2d 461, 466 (S.C. 2004). "[T]he plaintiff in a SCUTPA action is required only to allege and prove those facts sufficient to demonstrate potential for repetition; at that point, [the] plaintiff has proven an adverse effect on the public interest sufficient to recover under the SCUTPA." *Liberty Mut. Ins. Co. v. Emp. Res. Mgmt., Inc.*, 176 F.Supp.2d 510, 516 (D.S.C. 2001). "However, conduct that affects only the parties to the transaction and not the public interest provides no basis for a SCUTPA claim." *Bessinger*, 305 F.Supp.2d at 581.

The court focuses on the third element of Plaintiff's SCUTPA claim, as it is dispositive. Regarding this element, Plaintiff has alleged as follows:

- *Square knows that its products are used for illegal or improper uses, including fraudulent or illegal sales of goods or services, money laundering, and terrorist financing.*

- As set forth below, Square's repeated failure to follow the rules, and its ignorance of multiple red flags in the Grisel account(s), caused Big Red Box to be defrauded for nearly $1.1 million dollars.

- Regarding the above red flags, had Square been monitoring the account as required, it would have seen:

o That every one of the 79 transactions processed by Square (totaling almost $1.1 Million) were made using the same three credit cards and three [Bank Identification Number ("BINS")], to wit: 27 transactions to the same BANA Mastercard (BIN 5474) totaling $138,751.50, and 52 transactions to same or similar AMEX (BINs 3767 and 3727) totaling $911,245.47. Besides these three cards / BINS, Square processed no other charges on Grisel's Square account. In other words, the sole purpose of the Square's Local List account was to charge one of three credit cards belonging to a single payor, BRB.

o That 58 of the 79 transactions were at, near, or above reportable CTR threshold of $10,000.00 and numerous transactions more than doubled the CTR threshold.

- Defendants' duty arises additionally from their undertaking to generate fees and profits by providing services to Grisel and his confederates including G5, which fees were paid by BRB, and which to date are retained by Defendants.

- *The actions of the Defendants have a real and substantial potential for repetition and affect the public interest*, as shown by the following facts and such others as may be shown at trial:

    o The assessment and processing of fraudulent charges by one or both Defendants on over 79 occasions;

    o *Square's pattern and practice of allowing, participating in, and profiting by a willful failure to vet prospective users or detect or investigate fraudulent conduct, including red flags of fraudulent activity under its own guidelines, while retaining fees as a "payment processor."*

[ECF No. 149 ¶¶ 28, 39, 61, 138, 146 (citations omitted and emphasis added), *see also* ECF No. 164 at 15–16 (arguing the above allegations state a claim that Square had an adverse impact on the public interest)].

The above allegations fall into two groups: Plaintiff's allegations concerning Square's actions in the instant case and Plaintiff's allegations as to Square's "pattern and practice," emphasized above. The former allegations include supportive facts. However, the latter allegations are conclusory. In sum, Plaintiff alleges Square knows its products are used for illegal or improper uses, Square failed to follow its own rules in this case, and Square could do so again.

Plaintiff has failed to offer any allegations, beyond conclusory allegations, that Square's "*procedures* created a potential for repetition of the unfair and deceptive acts." *Singleton*, 595 S.E.2d at 466 (emphasis added). Instead, Plaintiff has alleged that, solely in the context of the scheme as perpetuated by Tye Grisel, Square violated its own procedures. In short, Plaintiff has alleged "conduct that affects only the parties to the transaction and not the public interest." *Bessinger*, 305 F.Supp.2d at 581; *see also id.* at 584 ("To sustain a cause of action under the SCUTPA, the plaintiffs must establish, by specific facts, that members of the public were adversely affected" by a defendant's actions).

Plaintiff appears to argue that plausible allegations, that Square's system affords potential for repetition, is "beyond the preliminary discovery given in this case" and can be addressed at summary judgment. [ECF No. 175 at 11 n.12]. However, as has been repeatedly held by courts in this district, conclusory allegations, like those provided by Plaintiff here, are insufficient to state a claim under SCUTPA, warranting dismissal. *See Ameristone Tile, LLC v. Ceramic Consulting Corp.*, 966 F. Supp. 2d 604, 621 (D.S.C. 2013) ("beyond this conclusory statement, Ameristone provides no specific facts demonstrating that the Defendants have conducted the same kind of actions in the past or that their procedures or business practices created a potential for repetition in the future"); *Pulliam v. Clark*, C/A No. 4:11-CV-03047-RBH, 2012 WL 1835717, at *7 (D.S.C. May 21, 2012) ("The sole allegation regarding this is in paragraph 84, which states that First Century's acts and practices are capable of repetition because the bank 'continues to be actively engaged in the banking business in the state of South Carolina.' However, the fact that an actor is still alive and engaged in the same business is not sufficient to establish a potential for repetition."); *First Nat. Bank v. First Nat. Bank of the S.*, C/A No. 6:07-2182-HMH, 2007 WL 3232116, at *2 (D.S.C. Oct. 31, 2007) (dismissing SCUTPA claim where "[t]he only harm alleged by the Defendants in the complaint is that FNB's actions 'caused Defendant to suffer lost profits, loss of goodwill and damage to their

respective reputations'"); *Ethox Chem., LLC v. Coca-Cola Co.*, C/A No. 6:12-01682-TMC, 2013 WL 41001, at *3 (D.S.C. Jan. 3, 2013) ("Even if Coca-Cola has been accused of similar past violations, which the court is not assuming without additional factual allegations, allegations of accusations are not the same as allegations of specific similar past acts. Similarly, the complaint fails to allege any specific procedures or business practices that create the potential for repetition. The court also notes that the outcome of this case will affect only the parties and not the broader public.").[15]

In opposition to Square's motion to dismiss, Plaintiff makes a number of similar arguments, such as "Square's system incentivizes willful blindness to fraud by making it profitable," "Square's perverse fee incentive for allowing

---

[15] The above case law, and Plaintiff's allegations, stands in contrast to cases where courts have found sufficient allegations or evidence of an adverse impact on the public interest. *See, e.g., Singleton*, 595 S.E.2d at 468 ("Because Stokes admitted that it was a standard business practice to handle deals in this manner, we find that such acts were capable of repetition, having the requisite impact on the public interest."); *Haley Nursery Co. v. Forrest*, 381 S.E.2d 906, 908–09 (S.C. 1989) ("Haley's breach of warranty impacts on the public interest because of the potential for repetition by publication of these misrepresentations to other consumers."); *Liberty Mut. Ins. Co.*, 176 F. Supp. 2d at 527 ("There can be little doubt that ERM's continuing pattern of deception regarding its workers' compensation coverage in this instance impacts the public interest."); *Wright v. Craft*, 640 S.E.2d 486, 503 (S.C. Ct. App. 2006) ("The record is replete with evidence indicating Craft has previously engaged in and would continue to engage in the same business practices and procedures that affected his transactions with Wright."); *deBondt v. Carlton Motorcars, Inc.*, 536 S.E.2d 399, 407 (S.C. Ct. App. 2000) ("If, as deBondt alleges, Mercedes knew its dealers enticed their customers [via a promotional program] and then placed all orders as stock orders without informing the customers, a jury could determine the administration

fraud . . . virtually guarantees that Square's conduct here being repeated," and "judging by its actions in this case, it can be reasonably inferred that Square has implemented intentionally lenient procedures to detect and prevent fraud to profit from fraudulent activity on its platform." [ECF No. 164 at 16]. However, Plaintiff does not cite any case law, nor is the court aware of any, holding that a plaintiff sufficiently alleges adverse impact on the public interest under SCUTPA by alleging a defendant makes a profit on the unfair or deceptive practices at issue.

Accordingly, the undersigned recommends dismissal of Plaintiff's claim for violation of SCUTPA against Square.[16]

III.    Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends the district judge set aside default as to Tye Grisel and direct Plaintiff to file either a motion for default judgment as to G5 or file a notice that Plaintiff is dismissing G5 from this suit. Additionally, the undersigned recommends the district judge grant in part and deny in part Square's motion to dismiss [ECF No. 155], grant in part and deny in part Joe Grisel's motion to dismiss [ECF No. 162], and deny Tye Grisel's motion to dismiss [ECF No. 163], dismissing

---

of the program was an unfair and deceptive act prohibited by the UTPA").

[16] Given the recommendation above, it is unnecessary to address Plaintiff's and Square's arguments as to whether Plaintiff has sufficiently alleged that Square's actions constitute unfair or deceptive practices as defined by SCUTPA.

Plaintiff's claims for (1) aiding and abetting against Square and Joe Grisel, (2) conversion against Square, (3) negligence against Square, and (4) violation of SCUTPA against Square, and allowing to proceed Plaintiff's claims for (1) conversion against Joe Grisel and Tye Grisel and (2) unjust enrichment against Square.

IT IS SO RECOMMENDED.


*Shiva V. Hodges*

January 22, 2020                          Shiva V. Hodges
Columbia, South Carolina          United States Magistrate Judge


**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).